DOXTATOR *v.* CHICAGO & WEST MICHIGAN RAILWAY CO.

RAILROAD COMPANIES — INJURY TO EMPLOYÉ — AMPUTATIONS — DISPOSITION OF FRAGMENTS.

 A railroad company is not liable to a widow for failure to deliver to her, after her husband's death, portions of his limbs which were amputated by the company's surgeon because they had been crushed by the cars while he was-in the employ of the company, when the operation was performed at a hospital to which he was taken by a policeman in charge of the city ambulance, and the fragments were cremated according to the custom at the hospital, as the company did not assume the obligation, either by its employé who lifted the injured man from the ground, or by the surgeon who amputated his limbs, to deliver the remains, and the whole of them, to his widow, if death should ensue from the injury.

Error to superior court of Grand Rapids; Burlingame, J. Submitted October 7, 1898. Decided July 11, 1899.

Case by Fanny E. Doxtator against the Chicago & West Michigan Railway Company for failure to deliver to plaintiff for burial the entire remains of her deceased husband. From a judgment for plaintiff, defendant brings error. Reversed.

*William Alden Smith,* for appellant.

*McGarry & Belden* (*Brown & Adams,* of counsel), for appellee.

MONTGOMERY, J.   This case presents a question which
has never had the attention of this court, and one which,
in some of its aspects, has not been considered by any
other court of last resort, so far as we are advised.   The
plaintiff sues to recover damages on account of having
been deprived of the right to give the remains of her
deceased husband a Christian burial, and alleges that she
was deprived of this right by the wrongful act of the de-
fendant.   At the common law there was said to be no
property in a dead body, and in one sense this may still
be deemed an accurate technical statement; but it has
been held in a number of well-considered American cases
that the one whose duty it is to care for the body of the
deceased is entitled to possession of the body as it is when
death comes, and that it is an actionable wrong for an-
other to interfere with that right by withholding the body
or mutilating it in any way.   *Larson* v. *Chase*, 47 Minn.
307 (28 Am. St. Rep. 370); *Foley* v. *Phelps*, (Sup.) 37 N.
Y. Supp. 471; *Burney* v. *Children's Hospital*, 169 Mass.
57 (61 Am. St. Rep. 273); 8 Am. & Eng. Enc. Law (2d
Ed.), 834.   This right is conceded.

Another question, not discussed in the original brief of
appellant, although adverted to in its supplemental brief,
may be whether, under the facts as claimed by plaintiff,
the right of action exists in the widow for the destruction
of fragments amputated from the body of her husband
during his lifetime, when the evidence discloses the fact
that such destruction occurred during the lifetime of the
husband.   As this question was not at all discussed in the
original brief of counsel, we pass it by, and direct our
attention to the points raised; and for the understanding
of these points a brief statement of the facts is essential.

On the morning of June 2, 1897, Thomas A. Doxtator
was working as a switchman with a gang of men in
charge of John Dozeman, foreman of the West Side yards
of the Chicago & West Michigan Railway Company.   At
about 6:30 a. m. Doxtator was run over by the cars and
fatally injured.   His injuries were extensive.   His right

leg was crushed from the ankle to the knee. The bone protruded, and the foot hung only by the muscular attachments. The left leg was crushed from the lower third up to about the middle third of the thigh, and the pelvic bones were also broken. Foreman Dozeman was the first to reach Mr. Doxtator, and he called witness Strickland to hold his head while Dozeman called the doctor and the ambulance. Dozeman called Dr. G. K. Johnson, who was at that time chief surgeon for the Chicago & West Michigan Railway Company. He also notified police headquarters to send the ambulance at once, and then notified the company's agent at the Allen-street freight house (Mr. Hatch), who also telephoned to the doctor. Doxtator requested that he should not be taken home, as the shock would kill his wife. He requested to be taken to a Catholic hospital. One witness testified that witness Strickland promised that he should be taken to a Catholic hospital, without naming which one. Strickland, however, testified that he did not remember whether Doxtator so requested or not. The custom of the railway company, as stated by Dr. Johnson, is to take the patient to whichever hospital he prefers. The ambulance arrived about 25 minutes after the accident had occurred. It was in charge of Patrolman John Scobey. While in the ambulance, Doxtator requested to be taken to a Catholic hospital. Patrolman Scobey thought it was nearer to Butterworth Hospital, and so took him to that place, accompanied by Switchman Strickland. Neither Doxtator nor Strickland raised any objection to his so doing.

They reached the hospital at 5 minutes to 7 in the morning. The hospital force called Dr. Lupinski, who, on the arrival of Dr. Wooster, turned the case over to the latter. Dr. Wooster had exclusive control of the case, and was working under a general employment by the Chicago & West Michigan Railway Company. With the assistance of Dr. Lupinski and of Dr. Smith, the house physician of the hospital, he amputated the legs at about 8 o'clock in the morning. From the nature of the case, the doctors

knew that the wound was necessarily fatal. The left leg was taken off near the thigh; the right leg, below the knee. Neither Dr. Lupinski nor Dr. Smith was employed by the railroad company, but Dr. Lupinski assisted in the operation without any special agreement, having been called by the hospital. One Clarence L. Brainard, the orderly of the hospital, attended upon the surgeons, and testified for the plaintiff that he burned the fragments about 9 or 10 o'clock in the morning. He testified that he asked, in the presence of Dr. Lupinski and Dr. Wooster, what he should do with the fragments; that Dr. Lupinski replied, and that he had no instructions from any other physician; that, when he asked Dr. Lupinski what to do with the fragments, Dr. Lupinski inquired what was usually done with such fragments, and, being told by the orderly that they were usually burned, directed the orderly to do as he had been accustomed to do. Dr. Wooster testified that he knew nothing of the disposition of the fragments, and had nothing to do with it; that he gave no instructions whatever regarding them, and did not know of their whereabouts or disposition.

The theory of the plaintiff is that, when the railroad company lifted Doxtator from the ground, it took upon its shoulders a duty, and that duty was to care for him while he should live, and at his death deliver his remains, and the whole of them, over to his wife for burial; that the company did not do this, but, instead, negligently allowed the cremation of the dissevered limbs, and is therefore liable to the widow in damages. It becomes important, therefore, to inquire just what duty the railroad company was under, and just how far it assumed control over the injured man. This question must, in the main, be determined as one of first impression, as no case analogous has been cited, and our research has not been more successful than that of the learned counsel on either side of the case, who are to be commended for the exhaustive examination which they have given the subject. When this accident occurred, the common instincts of humanity forbade that

this injured man be left to lie where he had fallen. His fellow workmen or any stranger would be impelled to minister to him, and the first impulse would be to call a surgeon and an ambulance, and see that he was taken where he could be treated. The yard foreman performed this plain duty, by notifying Dr. Johnson, the surgeon of the road, and calling the ambulance from police headquarters. By doing so, neither the foreman nor the railroad company can be said to have become bailee, or to have assumed such a control over the injured man as to preclude the relatives from assuming charge of the ministrations to him. But by Doxtator's own request he was not taken to his home. The policeman in charge of the ambulance evidently did not look to the yard foreman or any other official for his instructions. It was at his suggestion, and without dissent from Doxtator or his fellow workman, Strickland, that he was taken to Butterworth Hospital, instead of to a Catholic hospital. On arriving at the hospital, the hospital authorities took charge of him and called Dr. Lupinski. Had Dr. Wooster not appeared, could it be successfully contended that those connected with the railroad company had done more than humanity required, or had rendered the company liable for any further neglect of, or injury to, the unfortunate man? To admit such a contention would amount to punishing one for ministering to the comfort of a distressed fellow creature. Such cannot be held to be the obligation of those concerned in removing this unfortunate man to an appropriate place for treatment. They did precisely what they ought to have done, and are to be commended, rather than censured, for so doing.

What, then, was the obligation assumed by Dr. Wooster? He found the patient in an appropriate hospital, with another surgeon in attendance, and, as he says, assumed charge of the case. Dr. Lupinski continued to assist. Did Dr. Wooster, by thus assuming charge of the case, take upon himself, as the agent of the railroad company, the duty of seeing to it that, when death ensued, the body

should be delivered to the widow, or did his duty consist merely of performing such operations as the nature of the case required, leaving it to the attendants at the hospital to make such disposition of the parts amputated as custom warranted? We are of the opinion that the duty assumed by Dr. Wooster was the latter kind, merely, and that neither in purpose nor in fact did he assume to take charge of the dismembered parts. The assumption of the charge of the case was simply assuming charge of the operation, and the operation was performed under the conditions as Dr. Wooster found them. The patient was in a reputable hospital. Dr. Wooster had no knowledge of any direction as to the disposition of the amputated parts, and was not in fault in not assuming and guarding against an unwarranted disposition of them.

Under the testimony, the defendant was entitled to a directed verdict.

Judgment will be reversed, and a new trial ordered.

HOOKER, MOORE, and LONG, JJ., concurred. GRANT, C. J., did not sit.